UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:15-cv-246-MOC

| BRADFORD D. ALLEN, | ) |
|---|---|
| Plaintiff, | ) |
| vs. | ) ORDER |
| MADISON CO. SHERIFF'S DEPT./JAIL, ET AL., | ) |
| Defendants. | ) |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by Defendants Michael Garrison, Buddy Harwood, and Tommy Worley. (Doc. No. 60).

**I.  BACKGROUND**

Pro se Plaintiff Bradford D. Allen is a federal inmate currently incarcerated at the Atlanta U.S. Penitentiary. The moving Defendants are: (1) James Harwood, employed at all relevant times as the Sheriff of Madison County in Madison County, North Carolina; (2) Michael Garrison, employed at all relevant times as the Chief Deputy Sheriff of the Madison County Sheriff's Department; and (3) Tommy Worley, employed at all relevant times as a correctional officer by the Madison County Sheriff's Department. Plaintiff filed this action on November 2, 2015, under 42 U.S.C. § 1983, alleging that movant Defendant Worley used excessive force against him when tasing Plaintiff while Plaintiff was a federal inmate housed at the Madison County Detention Center in Madison, North Carolina, under the supervision of Sheriff's Department officials. Plaintiff also alleges that Defendants were deliberately indifferent to

1

Plaintiff's serious medical needs following the tasing incident. Plaintiff also appears to make allegations in his Complaint that purport to raise a claim for a violation of his First Amendment right to access to the courts, and a claim of retaliation for reporting the constitutional violations. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

On October 13, 2016, Defendants filed the pending summary judgment motion, arguing in part that Plaintiff failed to exhaust his administrative remedies before filing this litigation, as is required by the Prison Litigation Reform Act (hereinafter "the PRLA"). 42 U.S.C. § 1997e(a) (2016). (Doc. No. 60). Defendants further contend that they are entitled to summary judgment on the merits because Plaintiff suffered no injuries from the tasing incident and that he further failed to show that Defendants were indifferent to his serious medical needs.

On October 14, 2016, this Court entered an order, in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. (Doc. No. 70). Plaintiff filed a response to the summary judgment motion on October 28, 2016. (Doc. No. 75). On July 31, 2017, and August 11, 2017, the undersigned held an evidentiary hearing on the sole issue of Plaintiff's exhaustion of administrative remedies. On October 23, 2017, following the evidentiary hearing, this Court ordered the parties to submit supplemental memoranda addressing the evidence presented at the evidentiary hearing on the issue of exhaustion. (Doc. No. 96). On December 7, 2017, the moving Defendants submitted their supplemental memorandum. (Doc. No. 104). On January 24, 2018, Plaintiff submitted his supplemental memorandum. (Doc. No. 106). Defendants submitted their Reply on January 31, 2018. (Doc. No. 108). Thus, this matter is ripe for disposition.

2

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

3

## III. DISCUSSION

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a Section 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. In Porter v. Nussle, 534 U.S. 516 (2002), the Supreme Court held that the PLRA's exhaustion requirement applies to all inmate suits about prison life. The Court ruled that "exhaustion in cases covered by § 1997e(a) is now mandatory." Id. at 524 (citation omitted). The Porter Court stressed that, under the PLRA, exhaustion must take place before the commencement of the civil action in order to further the efficient administration of justice. Id.

In Woodford v. Ngo, 548 U.S. 81 (2006), the Supreme Court held that the PLRA exhaustion requirement requires "proper" exhaustion: "Administrative law . . . requir[es] proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" Id. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). In Jones v. Bock, 549 U.S. 199 (2007), the Supreme Court stated: "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Id. at 211 (citing Porter, 534 U.S. at 524). Under the procedural requirements set forth in Woodford, Plaintiff herein must have followed and availed himself of the inmate grievance procedure as set forth in the Madison County Detention Facility Policy and Procedure Manual, before filing this litigation.

Finally, the Supreme Court recently noted three situations where an inmate need not exhaust the administrative grievance process, where by no fault of his own he is prevented from

4

availing himself of it: (1) where an administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where an administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross v. Blake, 136 S. Ct. 1850, 1859-60 (2016).

In light of the evidentiary hearing on the sole issue of exhaustion of administrative remedies, this Court makes the following findings:

This Court finds that the credible testimony of all witnesses called by Defendants at the evidentiary hearing demonstrated that the Madison County Detention Facility (hereinafter "Facility") has an internal Inmate Grievance Policy and Standard Procedure for inmates who would like to address issues related to their confinement; that there is a standard protocol in place for handling grievances which is followed by jail staff at all times; that the grievance procedure is commonly used by inmates; that Plaintiff had access and ability to request, complete, and return an inmate grievance form; that no one employed by the Facility subverted or prevented Plaintiff from participating in the grievance procedure; and when, above and beyond the grievance procedure, Plaintiff was provided with the opportunity to receive medical treatment based on his verbal requests for treatment, he declined such treatment.

First, it is undisputed that the Facility maintains an Inmate Grievance Policy and Standard Procedure as an internal administrative remedy for inmate grievances. (Def. Ex. 1 and 2; Doc. No. 94 at pp. 56-58). Every inmate receives a copy of those procedures, and it is available in communal areas. (Doc. No. 94 at pp. 58-59). To further aid inmates in availing themselves of the grievance procedure, the Facility provides a Standard Inmate Grievance Form upon request.

5

(Id. at pp. 57, 63).

When an inmate requests a grievance form under this procedure, the Facility jail staff follows a specific protocol, which protocol was consistently recited by all current and former staff witnesses who testified at the evidentiary hearing. Upon request, the inmate is provided with a Grievance Form, which the inmate may keep and complete at his leisure. (Doc. No. 94 at p. 57). Once an inmate completes the Form, the inmate submits it to any jail staff member; the staff member places the form in the mailbox for Jail Administrator and Captain Tom Banks; the Captain places a written response directly on the form the same day or, if after 5:00 p.m., on the next business day when he is working; and Captain Banks then places the form with the response thereon in the inmate's file. Captain Banks, former Chief Deputy Michael Garrison, former Deputy Jamie Cooke, detention officer Cathy Johnson, former detention officer Will Martin, and former detention officer Helen Wyndham all consistently described this standard practice and protocol during their testimony, despite being sequestered from hearing one another's testimony. (Doc. No. 93 at pp. 26, 29, 70-71, 99-100, 114-115; Doc. No. 94 at pp. 56-58, 63-64, 91). Moreover, the same witnesses consistently confirmed that this same procedure is available to inmates in lockdown, where they have the ability to submit the form by handing it to an officer directly or through the cell doors. (Doc. No. 93 at pp. 22, 70, 91; Doc. No. 94 at pp. 91-93).

Further, Defendants' witnesses and evidence consistently confirmed that all inmates, including Plaintiff, have access to the grievance forms, and that the grievance procedure is routinely and abundantly used by inmates at the Facility. Former Deputy Jamie Cooke testified that he did not recall if he received a completed grievance from Plaintiff "because it is routine every day" and "[w]e do it all day every day." (Doc. No. 93 at p. 24). Former detention officer Emily Silvers acknowledged that she accepted numerous requests, including requests on

6

grievance forms, daily. (Id. at p. 55). Moreover, Defendants' Exhibit 4 at the hearing was a compilation of numerous grievances pulled from inmate files to show what a properly filed grievance looks like, and which also demonstrates that the grievance policy was available and commonly used by inmates at the Facility. (Def. Ex. 4; Doc. No. 93 at pp. 64-65).

The current and former jail employees who testified also consistently denied subverting or attempting to destroy or tamper with any grievances submitted by Plaintiff or any other inmate in order to protect an officer, or for any other reason. (Doc. No. 93 at pp. 5-6, 38, 46, 70, 101; Doc. No. 94 at pp. 69, 119). In fact, the employees had no reason to attempt to hide Plaintiff's grievance. Five of the witnesses who testified on behalf of Defendants were no longer employed by the Facility and, therefore, had no monetary interest, bore no risk of adverse consequences, and had nothing to gain whatsoever by testifying favorably for Defendants. (Doc. No. 93 at pp. 8, 51, 88, 108; Doc. No. 94 at p. 89). Moreover, the jail staff had nothing to gain by attempting to hide any grievance by Plaintiff about the tasing incident involving Officer Worley, as the entire jail staff was notified by electronic mail about the incident, pursuant to standard procedure, and thus, everyone was already aware of same independent of any grievance. (Doc. No. 93 at p. 44-47, 60, 70).

The credible evidence presented at the evidentiary hearing shows that Plaintiff never submitted a grievance on the claims he purports to bring in this action, and he has, thus, failed to exhaust his administrative remedies. The only witness at trial who had any knowledge or recollection of any proper grievance submitted by Plaintiff was Plaintiff himself. That is, Plaintiff submitted a single grievance form, identified as Plaintiff's Exhibit B-7, in an attempt to show that he exhausted his administrative remedies as to the claims brought in this action. See (Doc. No. 57 at 3). The grievance form, dated October 12, 2015, and signed by Plaintiff, had not

been responded to by Captain Banks or any other officers—it contains Plaintiff's handwritten complaints related to his diet; the tasing incident with Worley; Plaintiff's complaint that he was put on lockdown in retaliation; Plaintiff's claim that staff was holding Plaintiff's incoming mail; Plaintiff's claim that his grievances were being ignored; and Plaintiff's claim that he had not seen a doctor since the tasing incident, despite having had two seizures. See (Id. at 4). This grievance form was not in Plaintiff's inmate file and had never been seen before by Facility staff. When this Court inquired how he was able to obtain a copy of that grievance, Plaintiff testified that, at Plaintiff's request, on around November 6, 2015, former Deputy Jamie Cooke retrieved the grievance form that Plaintiff alleges be submitted and made him a photocopy of the form.[1] (Doc. No. 93 at p. 4; Doc. No. 94 at pp. 21-23). However, when asked whether Plaintiff's account regarding his Exhibit B-7 was accurate, Cooke unequivocally denied that he copied or provided a grievance form to Plaintiff. Cooke, in fact, denied ever making a copy of any grievance for any inmate during his entire tenure at the Facility:

> Q: Now, if [Plaintiff] had asked you to go and check on the status of a grievance. In doing that—would you have ever done that if he asked you to check on it?
> A: If an inmate says, can you check? Like, if we're walking through and the stack's still in the box, then I will say they haven't done anything with them.
> Q: Okay.

---

[1] As noted, the grievance at issue that Cooke allegedly retrieved had no notation whatsoever by any officer—it merely contained Plaintiff's complaints. The witness officers testified that a grievance form would not have been placed in Plaintiff's file without some written response by an officer. In response to this testimony by the officers, Plaintiff maintained at the evidentiary hearing, however, that he was not contending that Cooke retrieved the grievance from Plaintiff's file but, rather, that he pulled it from Plaintiff's grievance box. To believe this, the Court would have to believe that the grievance, purportedly placed in the grievance box on October 12, 2015, was still sitting in the grievance box on November 6, 2015, several weeks after Plaintiff purportedly submitted the grievance, when Plaintiff claims that Cooke pulled the grievance out of the grievance box for him. See (Doc. No. 94 at pp. 21-22). The officer witnesses testified, however, that grievances were processed through on a daily basis. It simply does not make sense that this grievance would still be sitting in the grievance box weeks after it was purportedly placed there. Moreover, as noted, Cooke denies that he retrieved this grievance for Plaintiff.

> A: If I think about it when I go by, it's just a glance. It's not go through and look to see. Because they just don't pick one out and go do something with it. They take the whole pile. Because you watch it on camera. Every morning they'll pick the whole pile up and then he sorts through them all with our staff—medical person there to see who's priority and, you know, who's in dire need of emergency care or medical care.
> Q: And your experience is Captain Banks was the one who checked that box during this time period?
> A: Yes. Nobody touches them but him.
> Q: Okay. Would you have ever gone into that box—in you recollection, have you ever gone into his box and pulled a single grievance out and made a copy of it to give to an inmate?
> A: No. There's nothing done in that box.
> Q: Okay. Once you put the—
> A: They know what they wrote. I mean, like, if I would have pulled this one out of the box and made a copy of it, then that's what Mr. Allen would have got back was what he just wrote down. It would—they're waiting on the action taken to know what—
> Q: So you would not have just made a copy of the only thing he had written?
> A: Well, I wouldn't make a copy of something that they know what they wrote down. That—I mean they're wanting answers. So, no. No.
> Q: Okay. And so you—can you say with some assurance that you never pulled any grievance out of the captain's box and returned it back to [Plaintiff]?
> A: No. I cannot recall that at all.

(Doc. No. 93 at pp. 27-28). This Court also finds it significant that, although Plaintiff testified at the evidentiary hearing that he had specifically asserted in one of his Declarations, Docket No. 17, that Cooke had searched for and made a copy of Plaintiff's grievance, he admitted on cross-examination that Docket No. 17 never in fact said anything about Cooke retrieving the grievance and making a copy for him. See (Doc. No. 94 at pp. 32-33, 36-37).

Here, the Court simply finds Plaintiff's contentions not credible. Plaintiff certainly had the opportunity, and could have easily, left the facility with a blank grievance form, and then later filled it out to show that he filed the grievance while still at the Facility. Jail staff consistently testified that inmates are provided with blank grievance forms to complete at their leisure, and that they do not monitor what inmates do with the forms. (Doc. No. 93 at p. 32, 72-73). They also consistently testified that it would be "easy" for an inmate to retain a blank form

9

in his legal mail and leave the Facility with the blank form. (Doc. No. 93 at pp. 32-33, 72; Doc. No. 94 at pp. 65-66). In fact, Cooke recalled providing such a blank form to Plaintiff. (Doc. No. 93 at pp. 14-15, 24). Moreover, Plaintiff himself asserts that he was able to bring his Exhibit B-7 out of the Facility when he was transferred, which demonstrates the ease with which he could have simply left the Facility with the blank form and completed it later in anticipation of this litigation. Here, the respective interests of the witnesses in this cause support the credibility of the witnesses for Defendants over Plaintiff's credibility, as does the fact that the tasing was common knowledge at the jail, such that interfering with the grievance process would not aid anyone in hiding the fact of the incident. In other words, the Court finds that the Ross v. Blake situations that could relieve Plaintiff of the exhaustion requirement do not apply here.

Additionally aiding the Court in weighing credibility, all parties consistently testified that Defendants did, in fact, attempt to attend to the verbal complaints contained in Plaintiff's Exhibit B-7, despite not having actually received a formal grievance in accordance with procedure. Former Chief Deputy Garrison outlined those efforts in both his testimony and Affidavit filed herein. (Doc. No. 63; Doc. No. 94 at pp. 94-96). Moreover, Officers Cathy Johnson and Will Martin both confirmed that they made a medical appointment for Plaintiff at his verbal request, but when they asked him to complete the necessary paperwork in advance of the appointment, he refused.[2] (Doc. No. 93 at pp. 69, 100-101). In sum, for the reasons stated herein, the Court finds that Plaintiff did not exhaust his administrative remedies before filing this action. Therefore, this

---

[2] As Defendants point out, it does not make sense that Defendants would hide or destroy properly submitted grievances, while simultaneously seeking to provide this level of assistance to Plaintiff for exactly the circumstances which he claims he grieved. Rather, it is much more likely that Plaintiff attempted after the fact to cure his procedural defects before filing this litigation.

action will be dismissed based on failure to exhaust administrative remedies.

## IV. CONCLUSION

In sum, for the reasons stated herein, the Court grants Defendants' summary judgment motion.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 60), is **GRANTED**, and this action is dismissed without prejudice for failure to exhaust administrative remedies.

2. The Clerk is respectfully instructed to terminate this action.

Signed: February 28, 2018

Max O. Cogburn Jr.
United States District Judge